IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WISCONSIN ARCHERY PRODUCTS, LLC,

Plaintiff,

v.                                                    Case No. 24-2076-JAR

GARMIN INTERNATIONAL, INC.,

Defendant.

## MEMORANDUM AND ORDER

Plaintiff Wisconsin Archery Products, LLC ("Wisconsin Archery") brings this patent infringement action against Defendant Garmin International, Inc. ("Garmin"), alleging it infringed its U.S. Patent 8,316,551 ("the '551 Patent"), titled, "Auto-Correcting Bow Sight." This matter is before the Court on the parties' cross motions for summary judgment. The motions are fully briefed, and the Court is prepared to rule. For the reasons described below, Garmin's motion for summary judgment is granted and Wisconsin Archery's motion for summary judgment is denied.

## I.       Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. In applying this standard, a court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[1] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a

---

[1] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

reasonable jury could return a verdict for the non-moving party."[2]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[3]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[4]

The moving party must initially show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy this burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10]

---

[2] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[3] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).

[4] *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[5] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[6] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[10] *Adams*, 233 F.3d at 1246 (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

"Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[11]  Cross summary judgment motions should be evaluated as two separate motions.[12]  Just because the Court denies one does not require that it grant the other.[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.    Uncontroverted Facts

The following facts are uncontroverted, stipulated to, or viewed in the light most favorable to the nonmoving party.

### The '551 Patent and Garmin Products

Wisconsin Archery owns U.S. Patent 8,316,551 ("the Patent"), titled, "Auto-Correcting Bow Sight."  Garmin is the owner of the four products accused of infringing the '551 Patent: (1) Xero A1; (2) Xero A1i; (3) Xero A1i Pro; and (4) Xero X1i (the "Accused Products").  In October 2020, Garmin released the Xero X1i crossbow scope.  Around August 2021, Garmin announced the Xero A1 Pro bow sight, and then subsequently released the Xero A1 Pro sight for

---

[11] *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[12] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

[13] *Id.*

[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[15] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

sale in the Fall of 2021.  Garmin's newer Xero A1i Pro and Xero X1i are essentially the same as the older Xero A1 and Xero A1i products; any differences between the Accused Products are extraneous to the scope of the '551 Patent's claims.

### The Burris License

On March 11, 2015, Wisconsin Archery (licensor) and Burris Company ("Burris") (licensee) executed an exclusive licensing agreement ("License Agreement") regarding the '551 Patent.  The License Agreement granted "Burris an exclusive, worldwide license to the ['551] Patent to make, have made, use, sell, offer for sale and otherwise commercialize, exploit and enjoy any Products, articles or devices that incorporate a Product, methods and other inventions (collectively, "Inventions") disclosed in the ['551] Patent."[16]  Wisconsin Archery also granted Burris the exclusive right to "grant sublicenses to (A) third party manufacturers of Products, Product components or Inventions for Burris, (B) distributors of Products or Inventions for Burris and (C) Burris customers that purchase Products or Inventions from Burris."[17]

The License Agreement also included Section 4 titled, "Patent Infringement and Enforcement," which recited, in part: "[i]f either party learns of any potential or actual infringement of a ['551] Patent, such party will promptly notify the other party in writing of all of the relevant facts and circumstances known by the party in connection with the infringement."[18]  Section 4 also included a bifurcated Clause 4.2 titled, "Initiating an Infringement Action."[19]  Clause 4.2(A) stated:

> Burris has the right, but not the obligation, to institute an action to terminate the infringement of the ['551] Patent through

---

[16] Doc. 57-1 at 2.

[17] *Id.*

[18] *Id.* at 4 (Clause 4.1).

[19] *Id.* at 4.

4

negotiation, litigation, or alternative dispute resolution, at its sole discretion and sole cost.  Burris must notify [Wisconsin Archery] within 30 days of the Notification provided in § 4.1 above whether it elects to institute an action to terminate the infringement of the ['551] Patent through negotiation, litigation, or alternative dispute resolution.  The right to institute an action will be exclusive to Burris. Burris has the right to select and to control counsel in any action initiated by Burris.  Burris has the right to settle an action at its sole discretion and any recovery (whether of damages or of a settlement amount), after deducting Burris' attorney fees, and Burris' costs as defined by 28 U.S.C. § 1920, shall be subject to an 8% royalty payable to [Wisconsin Archery] within 30 days of Burris receiving a recovery of damages.  Any payment to [Wisconsin Archery] of a royalty from any recovery of damages or settlement Burris receives shall apply to the minimum royalty payments under § 3.3 above.[20]

Clause 4.2(B), titled, "Cooperation," added, "[i]f Burris initiates an action to terminate infringement, [Wisconsin Archery] must cooperate and lend its name to the lawsuit if required by law.  [Wisconsin Archery] must consent, which it shall not unreasonably withhold, if Burris proposes to settle an action."[21]  Further, Clause 4.4 required Wisconsin Archery to "maintain the ['551] Patent at the U.S. Patent and Trademark Office by timely paying all required maintenance fees."[22]

"If [Wisconsin Archery] is ever unwilling to pay a maintenance fee, [Wisconsin Archery] must inform Burris that [Wisconsin Archery] does not intend to pay the maintenance fee by providing Burris with 90 days written notice before the earliest opportunity to pay a maintenance fee.  Upon receiving such notice from [Wisconsin Archery], Burris may then elect to pay the maintenance fee and the amount of the fee plus any costs or expenses incurred in paying the fee (including attorneys fees) are fully creditable against any future royalty payment."[23]

---

[20] *Id.*

[21] *Id.*

[22] *Id.* at 5.

[23] *Id.*

Under Clause 6.2 (titled, "Termination by Burris"), Burris held the right to terminate the License Agreement "for any reason or no reason by providing 60 days prior written notice to [Wisconsin Archery]."[24]  But the License Agreement provided that either "party may terminate this Agreement for a material breach of the Agreement after 45 days written notice to the breaching party describing such breach, if such breach is not cured within 45 days of receiving the notice letter."[25]  If Wisconsin Archery and Burris disagree about whether a breach was sufficiently cured, the parties will "first, escalate the disagreement to their respective presidents or chief executive officers to attempt to resolve the disagreement; and thereafter submit only the limited issue of whether a breach has been sufficiently cured to a mutually agreed upon arbitrator for binding resolution."[26]

The License Agreement also provided that either party may terminate due to bankruptcy or upon mutual agreement.  The effect of termination depended on the manner.  If Wisconsin Archery terminated the License Agreement due to breach or bankruptcy, "all licenses and rights granted to Burris under Section 1 terminate and revert back to [Wisconsin Archery]."[27]  If Burris terminated the License Agreement due to breach or bankruptcy, "the licenses granted by [Wisconsin Archery] to Burris in Section Iconvert [sic] to a nonexclusive, royalty-free, perpetual license with the sub-licenses described in Section 1.2."[28]  However, if Burris terminated the License Agreement under Clause 6.2, "Burris must pay [Wisconsin Archery] a $500,000 termination payment," minus any qualifying payments in excess of $500,000 already made.

---

[24] *Id.* at 6.

[25] *Id.* at 7.

[26] *Id.*

[27] *Id.*

[28] *Id.*

The term of the License Agreement continued "until the expiration date of the ['551] Patent or until otherwise terminated" in a manner as stated above.[29]  In consideration of the License Agreement, Wisconsin Archery represented and warranted that it "has no agreement with any third party which conflicts in any way with its obligations to Burris under this Agreement, including but not limited to that it has not granted any other licenses to the ['551] Patent."[30]  The License Agreement also provided that if Wisconsin Archery "has additional patents or patent applications anywhere in the world that would block Burris from practicing the license, [Wisconsin Archery] will not assert against Burris any claims for infringement under those patents based on the manufacture, use, or sale of a Product or Invention made, used, or sold by Burris under this Agreement."[31]

Finally, the License Agreement contained a nonassignability clause.  This clause stated, in part, that the "Agreement is binding upon successors or assigns of all or substantially all of the relevant business assets of either party whether by sale of assets, sale of stock or other method, and no consent from the non-assigning party is required prior to such assignment . . . [and] will otherwise be nontransferable and non-assignable to third parties without the prior express written consent of the other party."[32]

### Procedural History of the '551 Patent

On April 20, 2018, pursuant to its rights under the License Agreement, Burris filed a patent infringement lawsuit (the "Burris Lawsuit") against Garmin in the United States District

---

[29] *Id.* at 6.

[30] *Id.* at 9.

[31] *Id.* at 4.

[32] *Id.* at 10.

Court for the District of Oregon.[33]  There, Burris alleged Garmin's Xero A1 and Xero A1i products infringed Claims 1–2, 4–5, 7–9, 12–13, and 20–26 of the '551 Patent.  On May 29, 2018, Garmin filed a petition for *inter partes* review ("IPR") of the '551 Patent with the United States Patent and Trademark Office ("USPTO").  Wisconsin Archery was a named party to and fully participated in the IPR of the '551 Patent.  On December 9, 2019, after a trial on the validity of the '551 Patent, the Patent Trial and Appeal Board ("PTAB") of the USPTO issued a final written decision invalidating the challenged claims of the '551 Patent.  Around January 2019, Burris withdrew its counsel and its defense of the IPR.  Wisconsin Archery never appealed the PTAB's ruling.

On April 1, 2020, in response to the PTAB's ruling, Burris and Garmin filed a Joint Notice of Voluntarily Dismissal in the Burris Lawsuit.  The Joint Notice stipulated that Garmin was "the prevailing party."[34]  On April 2, 2020, the Oregon District Court dismissed the Burris Lawsuit with prejudice pursuant to Burris and Garmin's Joint Notice of Voluntary Dismissal.  Wisconsin Archery was aware of the Burris Lawsuit while it was pending.  Wisconsin Archery never sought to intervene in the Burris Lawsuit, nor did Wisconsin Archery otherwise attempt to restrict the voluntary dismissal or amend the judgment.

Meanwhile, on February 11, 2020, Wisconsin Archery initiated an *ex parte* reexamination of the '551 Patent with the USPTO for the purpose of proposing amended claims.  On September 22, 2020, Wisconsin Archery submitted new claims in the *ex parte* reexamination.  On November 3, 2020, the USPTO allowed these new claims to the '551 Patent and issued a

---

[33] *Burris Company, Inc. v. Garmin Int'l, Inc.*, Case No. 6:18-CV-00700-AA.

[34] Doc. 8-7.  The Court notes that Garmin cites the joint stipulation attached to its motion to dismiss (Doc. 8), and not one attached to the summary judgment record.  However, Wisconsin Archery does not dispute this statement of fact, so the Court will judicially notice the joint notice filed with Garmin's motion to dismiss. *See* Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

reexamination certificate.  Finally, on March 5, 2024, Wisconsin Archery filed the present infringement action against Garmin.

## III.   Discussion

Wisconsin Archery and Garmin filed cross motions for summary judgment; each move on Garmin's preclusion defenses.  The Court first addresses whether Burris had standing to bring a lawsuit in the District of Oregon.  Next, if Burris did have standing, the Court turns to whether the Oregon Judgment forecloses the present action due to the principles of res judicata, also known as claim preclusion.  Finally, if res judicata does preclude the present action, the Court must determine whether the newer Xero A1i Pro and Xero Xli products are essentially the same as the older Xero A1 and Xero A1i products for the purposes of the *Kessler* doctrine's role in claim preclusion.  As explained below, the Court grants Garmin's cross motion for summary judgment.

### A.   The Oregon Judgment

Garmin argues the Oregon Judgment is a dismissal with prejudice and serves as a final judgment on the merits of the '551 Patent for the purposes of precluding Wisconsin Archery's present infringement action.  In response, Wisconsin Archery argues that the Oregon Judgment is null and void, because it was an absent necessary party to the Burris Lawsuit as Burris did not have standing to bring that suit.  Generally, "a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee."[35]  However,

> "this general rule–which we recognize as being prudential rather
> than constitutional in nature–is subject to an exception.  The
> exception is that, where the patentee makes an assignment of all
> substantial rights under the patent, the assignee may be deemed the

---

[35] *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000) (citing *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995)).

> effective 'patentee' under 35 U.S.C. § 281 and thus may have standing to maintain an infringement suit in its own name."[36]

As such, the Court addresses whether the License Agreement made an assignment of all of Wisconsin's Archery's substantial rights, which would provide Burris standing to maintain the Burris Lawsuit in its own name.

A patent owner may license away "all substantial rights in the patents-in-suit, in which case the [license] is tantamount to an assignment of those patents to the exclusive licensee, who may then maintain an infringement suit in its own name."[37]  "To determine whether an exclusive license is tantamount to an assignment, we 'must ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted.'"[38]  Because the general principles courts use to determine the intent of the parties is not unique to patent law, courts should utilize the governing law of the contract.[39]  However, "the question of whether the provisions effectuated a transfer of all substantial rights . . . is a legal question" that should be reviewed under Federal Circuit law.[40]

Here, the dispute largely focuses on the substance of what was granted under the License Agreement.  But to the extent the Court needs to interpret the License Agreement, Delaware contract law applies.[41]  The Federal Circuit has enumerated several rights that courts should

---

[36] *Id.* (citing *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991); *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995)).

[37] *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A., Inc.*, 19 F.4th 1315, 1319–20 (Fed. Cir. 2021) (citation modified).

[38] *See Alfred E. Mann*, 604 F.3d at 1359 (alteration in original) (quoting *Mentor H/S, Inc. v. Med. Device All., Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001)).

[39] *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1060 (Fed. Cir. 2020) (applying Delaware law).

[40] *Id.* (citing *Prima Tek*, 222 F.3d at 1377).

[41] The License Agreement's choice of law provision requires that it be interpreted under Delaware law. Under Delaware law, "a contract's construction should be that which would be understood by an objective, reasonable third party.  [The court] will read a contract as a whole and we will give each provision and term effect,

examine to determine whether a licensor has transferred away sufficient rights to give an

exclusive licensee standing to sue in its own name, including:

> the scope of the licensee's right to sublicense, the nature of license
> provisions regarding the reversion of rights to the licensor
> following breaches of the license agreement, the right of the
> licensor to receive a portion of the recovery in infringement suits
> brought by the licensee, the duration of the license rights granted to
> the licensee, the ability of the licensor to supervise and control the
> licensee's activities, the obligation of the licensor to continue
> paying patent maintenance fees, and the nature of any limits on the
> licensee's right to assign its interests in the patent.[42]

While the Federal Circuit has never established a complete list of these rights, the Federal Circuit

has observed that "'(1) the exclusive right to make, use, and sell . . . is *vitally important*,' and (2)

'the nature and scope of the [patentee's] retained right to sue accused infringers [and license the

patent are] the most important factor[s] in determining whether an [agreement] . . . transfers

sufficient rights to render the [other party] the owner of the patent.'"[43]  Finally, courts must

"examine the 'totality' of the agreement to determine whether a party other than the original

patentee has established that it obtained all substantial rights in the patent."[44]

Here, Garmin cites several provisions of the License Agreement as evidence that

Wisconsin Archery licensed all substantial rights to the '551 Patent to Burris.  Wisconsin

Archery rebuts with citations to other provisions of the License Agreement that evidence

Wisconsin Archery's continued ownership of its substantial rights.  In turn, the Court addresses

the rights granted and retained.

---

so as not to render any part of the contract mere surplusage." *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citations omitted).

[42] *Univ. of S. Fla. Rsch.*, 19 F.4th at 1320 (citing *Alfred E. Mann*, 604 F.3d at 1360–61).

[43] *Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 823 F.3d 615, 619 (Fed. Cir. 2016) (citing *Alfred E. Mann*, 604 F.3d at 1360–61) (emphasis in original).

[44] *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019) (quoting *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1321 (Fed. Cir. 2009)).

*Exclusiveness*

Wisconsin Archery, through the License Agreement, granted Burris an "exclusive, worldwide license to the ['551] Patent to make, have made, use, sell, offer for sale and otherwise commercialize, exploit and enjoy any Products, articles or devices that incorporate a Product, methods and other inventions . . . disclosed in the ['551] Patent."[45]  "In evaluating whether a particular license agreement transfers all substantial rights in a patent to the licensee, we pay particular attention to whether the agreement conveys *in full* the right to exclude others from making, using and selling the patented invention in the exclusive territory."[46]  Here, there is no dispute that the License Agreement granted Burris an exclusive worldwide license to the commercial enjoyment of the '551 Patent, and that such a grant is "vitally important" when considering whether an exclusive license grants all substantial rights to effectively view the license as an assignment for the purposes of standing.[47]

A patent "is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part."[48]  The importance attributed to each stick in this bundle varies, but "[w]hen a sufficiently large portion of this bundle of rights is held by one individual, we refer to that individual as the owner of the patent, and that individual [has prudential standing] to sue for infringement in his own name."[49]  And "[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions."[50]  As such, the scope of the exclusive, worldwide license

---

[45] Doc. 57-1 at 2.

[46] *Prima Tek*, 222 F.3d 1372, 1379 (Fed. Cir. 2000) (citing *Abbott Labs.*, 47 F.3d at 1132–33).

[47] *Alfred E. Mann*, 604 F.3d at 1360 (citing *Propat*, 473 F.3d at 193–94).

[48] *Id.* at 1360 (citation omitted).

[49] *Id.*

[50] *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891).

Wisconsin Archery granted to Burris is a significant consideration that supports a finding of all substantial rights granted.[51]  The significance of the scope of this exclusivity compounds as the Court addresses the other rights granted to Burris below.

### Sub-Licenses

Wisconsin Archery argues the restrictions to Garmin's right to sublicense signifies it retained substantial rights under the License Agreement.  The License Agreement recites, "Burris may grant sublicenses to (A) third party manufacturers of Products, Product components or Inventions for Burris, (B) distributors of Products or Inventions for Burris, and (C) Burris customers that purchase Products or inventions from Burris."[52]  The License Agreement also provided Wisconsin Archery's warranty that it "has not granted any other licenses to the ['551] Patent."[53]

Wisconsin Archery is correct that the License Agreement limited sublicenses to the above three categories.  But Wisconsin Archery fails to overcome a reading of the License Agreement as a whole, which also provides that only Burris had the right to sublicense.  Indeed, Wisconsin Archery did not even retain a veto right to sublicenses, which the Federal Circuit has found is merely a minor derogation from the grant of rights that does not substantially interfere with the full and exclusive use of the patent.[54]  Burris enjoyed an exclusive, worldwide license to the '551 Patent and was the sole entity permitted to grant sublicenses to manufacturers, distributors, and customers of the relevant products.  The fact that the License Agreement didn't also give Burris

---

[51] *See Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006) (finding an agreement's granting of the "exclusive right to make, use, and sell products covered by the patent . . . strongly favor[s] a finding of an assignment, not a license").

[52] Doc. 57-1 at 2.

[53] *Id.* at 9.

[54] *Vaupel*, 944 F.2d 870, 875 (Fed. Cir. 1991) ("The sublicensing veto was a minor derogation from the grant of rights.  It did not substantially interfere with the full use by [licensee] of the exclusive right.").

the right to sublicense for another unstated purpose does not mean Wisconsin Archery retained such a right. As such, the scope of Burris's ability to sublicense coupled with the exclusivity of its right supports a finding that Wisconsin Archery did not retain any substantial rights in the sublicense provision.

### Patent Infringement and Enforcement

"[T]he nature and scope of the licensor's retained right to sue accused infringers is the most important factor in determining whether an exclusive license transfers sufficient rights to render the licensee the owner of the patent."[55] It is uncontroverted that the License Agreement, in Section 4.2(A), provided Burris "the right, but not the obligation, to institute an action to terminate the infringement of the ['551] Patent through negotiation, litigation, or alternative dispute resolution, at its sole discretion and sole cost."[56] Further, this "right to institute an action will be exclusive to Burris," and Wisconsin Archery granted Burris the rights to "select and control counsel in any action initiated by Burris" and to "settle an action at its sole discretion."[57] Certainly, Burris initiated the Burris Lawsuit against Garmin on its own, in its own name, and Wisconsin Archery was aware of the Burris Lawsuit while it was pending and never sought to intervene or otherwise influence or restrict the Burris Lawsuit's subsequent dismissal.

Despite these rights licensed to Burris, Wisconsin Archery argues that its substantial rights were not given in this provision for a few reasons. First, Wisconsin Archery argues that it did not license away all substantial rights because it retained an 8% royalty on any recovered damages, less attorneys' fees and other costs as defined in that provision. However, "the fact that a patent owner has retained a right to a portion of the proceeds of the commercial

---

[55] *Alfred E. Mann*, 604 F.3d at 1363.

[56] *See* Doc. 57-1 at 4.

[57] *Id.*

exploitation of the patent . . . does not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent."[58]

On this point, Wisconsin Archery cites *Propat Int'l Corp.* and *Univ. of S. Fla. Rsch.* for the proposition that retention of an economic interest in the patent is evidence that substantial rights were retained by the licensor. However, those cases do not simply cite that proposition in isolation, rather they recited that general proposition in the contexts of their inapposite license agreements. For example, in *Propat Int'l Corp.*, the court found all substantial rights were not licensed where the licensor retained the rights to "[reasonably] veto litigation decisions," provide their "consent" for selecting targets of suit, and the court noted the licensor did not assign the right to "make, use, and sell the patented invention."[59] And in *Univ. of S. Fla. Rsch.*, the court simply recited the general proposition of a licensor's economic interest in a patent, as the license agreement at issue was *silent* on the right to sue, so the court never addressed the issue of economic interest in the enforcement of patent rights.[60] Such facts are not present here.

Here, the facts are more like those in *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*.[61] In *Vaupel*, the Federal Circuit stated the "ultimate question confronting" the court was whether the licensee could bring suit on its own or if it must join the licensor.[62] The court concluded the right-to-sue provision of the license did favor the finding that all substantial rights had been granted, as the only right retained by the licensor was the right to be notified.[63] The

---

[58] *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir. 2007) (citing *Rude v. Westcott*, 130 U.S. 152, 162–63 (1889)).

[59] *Id.* at 1190–91.

[60] *See Univ. of S. Fla. Rsch.*, 19 F.4th at 1321–23.

[61] 944 F.2d 870 (Fed. Cir. 1991).

[62] *Id.* at 877.

[63] *Id.*

court also emphasized that a licensor's right to infringement proceeds was "merely a means of compensation."[64]  Finally, the court noted that the "policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer," and that policy "is not undercut" where the right to sue rests solely with the licensee.[65]

In response, Wisconsin Archery argues that the License Agreement does not give Burris the sole discretion to settle but requires Wisconsin Archery's reasonable consent to settle.  But Wisconsin Archery points to Section 4.2(B), a separate clause of the enforcement provision. Section 4.2(B) states "Cooperation.  If Burris initiates an action to terminate infringement, [Wisconsin Archery] must cooperate and lend its name to the lawsuit if required by law. [Wisconsin Archery] must consent, which it shall not unreasonably withhold, if Burris proposes to settle an action."[66]  This language contrasts with Section 4.2(A) which states, "Burris has the right to settle an action at its sole discretion."[67]

Nonetheless, the Court agrees with Wisconsin Archery that the License Agreement is unambiguous.  "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions;"[68] and a "[party's] steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[69]  Here, the License Agreement clearly and simply retains Wisconsin Archery's right to reasonably consent to a settlement in the precise instance where Wisconsin Archery "must cooperate and lend its name to the lawsuit **if**

---

[64] *Id.*

[65] *Id.* at 875–76.

[66] Doc. 57-1 at 4.

[67] *Id.*

[68] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

[69] *Id.* at 1160.

**required by law**."[70]  Section 4.2(B) does not negate Section 4.2(A) that gives sole settlement authority to Burris in every other instance.  Wisconsin Archery's reading of the License Agreement would render Section 4.2(A) meaningless and illusory; such a reading of the License Agreement is unreasonable and asks the Court to produce an absurd result that no reasonable person would have contracted.[71]

Finally, Wisconsin Archery argues that their right to notice of litigation signifies their retention of substantial rights, but the Federal Circuit has explicitly held that the right to notice of litigation is not a substantial right.[72]  As such, the Court finds the License Agreement gave Burris the sole and exclusive discretion to sue for infringement.  The License Agreement also provided Burris with the sole discretion to settle any infringement action, except in an action where Wisconsin Archery *must* cooperate and lend its name if required by law.  This exception is a minor derogation from the grant of the right to sue and does not affect the ultimate, dispositive result: Burris had the unfettered right to sue in its own name without joining Wisconsin Archery, unless required to by law.[73]

### Maintenance Fees & Title

Wisconsin Archery argues that its retention of title and payment of maintenance fees for the '551 Patent supports their possession of substantial rights in the License Agreement.  The Court disagrees.  First, the Federal Circuit has already made clear that a patent owner's retention

---

[70] Doc. 57-1 at 4 (emphasis added).

[71] *Osborn*, 991 A.2d at 1159–60.

[72] *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1351 (Fed. Cir. 2016) (holding that "title to the patents, the responsibility to pay maintenance fees on the patents, and a right to notice of litigation and licensing activities are not substantial rights").

[73] *See Vaupel*, 944 F.2d at 875–76 (noting the license of the right to sue is particularly dispositive where the ultimate question of whether the licensee could sue on its own is answered in the affirmative).

of title to a patent is not a substantial right.[74]  Second, the Federal Circuit has also held that the licensor's continued responsibility to pay maintenance fees on a patent is not a substantial right.[75]  Third, Wisconsin Archery cites *Propat* for the proposition that "[t]he  responsibility to maintain a patent is one of the obligations that has been recognized by this court as an indication that the party with that obligation has retained an ownership interest in the patent."[76]  However, the *Propat* court made that finding in the context of an agreement that required the patent owner to more broadly  "maintain" the patents for their full terms, in addition to the right to terminate the license if the licensee failed to meet certain benchmarks.[77]

The License Agreement here is inapposite.  Here, the maintenance fees provision of the License Agreement does not require Wisconsin Archery to pay the '551 Patent's maintenance fees.  Rather, the License Agreement requires that Wisconsin Archery notify Burris should it ever decide not to pay a maintenance fee, at which point Burris could *elect* to pay the maintenance fee and *subtract* that amount from any future royalty payment.  Thus, the maintenance fees provision is more akin to a payment provision in benefit of Burris, not a provision protecting Wisconsin Archery's rights.  At bottom, neither of these rights on their own are substantial rights for the purposes of licensee standing, nor does their combination under the License impact Burris's standing in the Burris Lawsuit.[78]

---

[74] *Luminara*, 814 F.3d at 1351; *see also*, *Propat* 473 F.3d at 1189 ("Even if the patentee does not transfer formal legal **title**, the patentee may effect a transfer of ownership for standing purposes if it conveys all substantial rights in the patent to the transferee." (emphasis added)).

[75] *Luminara*, 814 F.3d at 1351.

[76] *Propat*, 473 F.3d at 1190–91.

[77] *Id.*

[78] *See Luminara*, 814 F.3d at 1351 (finding no substantial rights were retained where the licensor retained "the title to the patents, the responsibility to pay maintenance fees on the patents, and a right to notice of litigation").

*Term*

Courts consider the duration of the license when determining whether substantial rights have been granted.[79]  Here, absent termination as discussed below, the term of the License Agreement continues for the entirety of the '551 Patent's life.  This factor weighs heavily in favor of finding Wisconsin Archery licensed all substantial rights in the '551 Patent to Burris, particularly when considered in light of the exclusivity of the license as discussed above.  Indeed, the duration of the License Agreement's term colors the weight accorded to other rights granted to Burris, as the Court must "examine the 'totality' of the agreement to determine whether a party . . . has established that it obtained all substantial rights."[80]

*Termination*

The termination provision presents two significant issues to the Court: the breadth of Burris's right to terminate and whether Burris had standing in the Burris lawsuit.  First, Garmin argues the breadth of Burris's rights to terminate the License Agreement as compared to the termination rights of Wisconsin Archery supports a finding that Wisconsin Archery licensed away its substantial rights.  The Court agrees.  Here, Burris had the right to terminate the License Agreement for any reason or no reason with 60 days prior written notice; Wisconsin Archery had no such right.  Wisconsin Archery's termination rights were limited to the following conditions precedent (all of which Burris *also* enjoyed): termination for bankruptcy; termination upon mutual written agreement signed by authorized representatives; and termination due to material breach.

---

[79] *Alfred E. Mann*, 604 F.3d at 1360–61.

[80] *Lone Star*, 925 F.3d at 1229 (quoting *AsymmetRx*, 582 F.3d at 1321).

Moreover, even the effect of termination was in benefit to Burris. If Wisconsin Archery terminated the License Agreement due to material breach or bankruptcy, the License Agreement would revert all rights back to Wisconsin Archery. Conversely, if Burris terminated the License Agreement due to material breach or bankruptcy, the License Agreement would convert to a non-exclusive, royalty-free, perpetual license with the sub-licenses as already provided. Wisconsin Archery's ability to terminate the License Agreement simply due to breach, bankruptcy, or mutual agreement is not significant enough to find substantial rights retained, particularly where, as here, Burris had the exclusive right to terminate for any reason or no reason at all.[81]

Second, Wisconsin Archery argues Burris lacked standing in the Burris Lawsuit because Wisconsin Archery terminated the License Agreement due to Burris's material breach on February 11, 2020, before the dismissal of the Burriss Lawsuit on April 2, 2020. Because this dismissal came after Wisconsin Archery terminated the License Agreement, and because Wisconsin Archery was not a party to the Burris Lawsuit, Wisconsin Archery argues the Burris Lawsuit's dismissal cannot have a preclusive effect as Burris had no standing.

Under the terms of the License Agreement, Burris could terminate the agreement for any reason or no reason; but Wisconsin Archery could only terminate the agreement if Burris materially breached the agreement, in the event of bankruptcy, or if the parties mutually agreed to terminate. In support of its position that the agreement was terminated, Wisconsin Archery

---

[81] *FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.*, No. 3:15-CV-01879-BEN-BLM, 2017 WL 2349031, at *8 (S.D. Cal. May 26, 2017) (finding no substantial rights retained where the licensor's "ability to terminate the agreement is limited to situations when [the licensee] ceases to exist, enters liquidation, or becomes insolvent"); *Vaupel*, 944 F.2d at 875 (Fed. Cir. 1991) (finding a reversionary right to a licensed patent in the event of bankruptcy or termination of production by [the licensee] insubstantial); *Prima Tek*, 222 F.3d at 1378 (Fed. Cir. 2000) (finding a termination clause consistent with an assignment of patent rights where the agreement in question contained a termination clause whereby the license would terminate automatically if the licensee filed for bankruptcy or stopped production of the patented product).

relies on the Declaration of Timothy Gorsuch owner and principal of Wisconsin Archery Products, LLC.[82]  Gorsuch declares, "[o]n February 11, 2020, I sent an email to Steve Bennetts at Burris Company, Inc. ("Burris") terminating the License Agreement . . . Burris did not dispute that the License Agreement was terminated as of February 11, 2020."[83]  Gorsuch attached as support a photograph of a printed email from Gorsuch to Steve Bennetts on February 11, 2020, in which Gorsuch writes, "[w]e have decided to not file an appeal.  We therefore consider the agreement to be terminated as of today."[84]

But Wisconsin Archery provides no evidence that it terminated the License Agreement under its right to terminate for a material breach by Burris.  Gorsuch never mentions breach, much less declares that the License Agreement was terminated *due to material breach* as Wisconsin Archery argues in its summary judgment briefing while citing the Gorsuch Declaration.[85]  Further, Wisconsin Archery provides no argument or evidence that it ever provided Burris notice of any alleged material breach as required by the License Agreement.

Even if the Court found there was a dispute of material fact as to whether the License Agreement was terminated due to Burris's breach prior to the Burris Lawsuit's dismissal, such a finding would still be fatal for the present action.  A claim is not ripe for adjudication if it rests upon "contingent future events that may not occur as anticipated or indeed may not occur at

---

[82] Doc. 62-1; the Court also notes that Wisconsin Archery provided the Gorsuch Declaration only <u>after</u> Garmin's response brief/cross summary judgment brief stated, "Wisconsin Archery has proffered nothing beyond after-the-fact attorney argument to support its litigation-inspired characterization of the License Agreement—**no witness declaration or contemporaneous documentation were provided**."  *See* Doc. 57 at 21 (emphasis added).

[83] Doc. 62-1.

[84] *Id.*; Doc. 62-3 at 2.

[85] *See* Doc. 62 at 16–17 (Burris' "withdrawal from defense of the IPR constituted a material breach of the License Agreement.") (citing Docs. 62-1, 62-2).

all."[86] Wisconsin Archery agrees that the License Agreement provided Burris with the exclusive right to institute an infringement action. As such, for Wisconsin Archery to have standing in this lawsuit, there would need to be an adjudication of the breach issue first. It would be paradoxical for this Court to simultaneously find that (1) there is a question a fact as to Burris's material breach, sustaining termination, and (2) that Wisconsin Archery possesses standing to bring the present infringement action.[87] It is fundamental to *Wisconsin Archery's* standing in this action that there is no dispute as to whether the License Agreement terminated, thus reverting the necessary right to institute an infringement action.[88]

Nor does Wisconsin Archery provide any evidence that the parties mutually agreed to terminate. Gorsuch's Declaration states "Burris agrees the License Agreement was terminated," citing to an email from Gorsuch to Steve Bennetts.[89] But Wisconsin does not provide any evidence from Burris that it agreed to termination. The summary judgment record does not reveal *who* Steve Bennetts is, his professional title, or whether he is an authorized representative of Burris as contemplated by the License Agreement.

But assuming Bennetts was Burris's authorized representative, there is no reply email from him nor any other evidence that Burris agreed that the agreement was terminated. Gorsuch's self-serving declaration that Burris agreed is based on hearsay, an apparent out-of-court statement from Bennetts or someone else from Burris. At the summary judgment stage,

---

[86] *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–81 (1985) (quoting 13A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532, at 112 (1984)).

[87] *CopyTele, Inc. v. E Ink Holdings, Inc.*, 962 F. Supp. 2d 1130, 1144 (N.D. Cal. 2013) (finding the court need not address whether termination returned to the plaintiff enforcement rights under the patent because the "more fundamental problem" was whether the material breach occurred in the first instance).

[88] *Id.* at 1145 (finding a plaintiff failed to show it regained the right to enforce a patent where the plaintiff "simply by a *unilateral* declaration" stated, "that the . . . agreement [was] terminated . . . without any support").

[89] Doc. 62-1.

evidence need not be submitted "in a form that would be admissible at trial."[90]  Nonetheless, "the content or substance of the evidence must be admissible."[91]  Thus, for example, at summary judgment, courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form.[92]

Notably, Wisconsin Archery does not dispute that Burris filed the Burris Lawsuit on April 20, 2018, nor that Wisconsin Archery was aware of the Burris Lawsuit while it was pending.  Wisconsin Archery also never argues Burris failed to provide notice of Garmin's potential infringement in accordance with the License Agreement.[93]  Moreover, Wisconsin Archery agrees that it knew of the Burris Lawsuit when it was pending and never sought to intervene or otherwise restrict the dismissal or alter or amend the Oregon District Court's final judgment.[94]

In sum, Wisconsin Archery asks the Court, for the first time after its opening summary judgment motion, to find a declaration's internal hearsay creates a material dispute of fact as to when the License Agreement was terminated.[95]  It does not; and the Court finds that Wisconsin Archery fails to create a dispute of material fact as to whether the License Agreement was in

---

[90] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[91] *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995).

[92] *See Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1082 n.5 (10th Cir. 1999).

[93] *See* Doc. 57-1 at 4 ("If either party learns of any potential or actual infringement of a Patent, such party will promptly notify the other party in writing of all of the relevant facts and circumstances known by the party in connection with the infringement.").

[94] Wisconsin Archery argues throughout its briefing that *Garmin* should have joined Wisconsin Archery to the Burris Lawsuit due to the requirements of the License Agreement but fails to provide the Court any authority supporting the notion that it is a defendant's responsibility to join a non-party in accordance with that non-party's contract with the plaintiff.  Nor does the Court find the plain language of the License Agreement even requires such joinder.

[95] *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) (affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence").

effect at the time of the Buriss Lawsuit's dismissal.[96]  "Judges are not like prospectors, searching tirelessly for a glitter of relevant evidence in the towering mountain of documents that might have some relevance to the case."[97]

### Nonassignability

Finally, Wisconsin Archery argues the nonassignability provision of the License Agreement indicates a retention of its substantial rights, because neither party possessed the unfettered right to transfer its interest under the license Agreement without prior express written authorization of the other party.  But the License Agreement states that it is binding on successors or assigns of either party, *without consent* in the event of a transfer of all of the relevant business assets of such party, for example by a sale of assets or sale of stock.  But the License Agreement is otherwise non-transferable and non-assignable to a third party without prior express written consent.[98]  This provision is merely a precautionary provision "intended to protect the rights of the parties under the contract, not to proscribe, limit, or nullify their intent and purpose to vest immediately in the transferee the right to manufacture, sell, and use the [patented invention]."[99]

---

[96] *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n.4 (10th Cir. 2004) (assertions in an affidavit that were not supported in the record by corroborating evidence are insufficient to create a genuine question of material fact precluding summary judgment).

[97] *Adams v. Dyer*, 223 Fed. App'x. 757, 762 n.4 (10th Cir. 2007).

[98] Doc. 57-1 at 10.

[99] *Watson v. United States*, 222 F.2d 689, 691 (10th Cir. 1955); *McNeilab, Inc. v. Scandipharm, Inc.*, 95 F.3d 1164 (Fed. Cir. 1996) (finding that "the grant of the exclusive right to make, use, and sell the licensed subject matter is not significantly diminished by reasonable conditions to assure that the license remains with the chosen licensee"); *Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*, No. C 09-2651 MHP, 2010 WL 1948623, at *3 (N.D. Cal. May 13, 2010) ("[T]he combination of non-transferability and the consent requirement—both minor derogation of rights—also do not lead to a retention of substantial rights.").

In sum, the Court finds the License Agreement granted all substantial rights in the '551 Patent to Burris, thus Burris had standing to initiate and terminate the Burris Lawsuit on its own authority.

## B. Res Judicata

The Court turns to addressing whether the Burris Lawsuit serves as a basis for precluding the claim present in the instant action. Garmin argues that the dismissal with prejudice of the Burris Lawsuit served as a final judgment on the merits barring Wisconsin Archery from relitigating Garmin's alleged infringement of the '551 Patent. In response, Wisconsin Archery argues that, even if Burris had standing to bring the Burris Lawsuit, claim preclusion does not apply because, (1) there is no identity of the cause of action, because the patent claims at issue here are different than the patent claims at issue in the Burris Lawsuit; and (2) there is no identity of parties, because Wisconsin Archery was not a party to the Burris Lawsuit, nor was Wisconsin Archery in privity with Burris.

"In assessing claim preclusion, we apply the law of the regional circuit in which the district court sits."[100] "To apply claim preclusion, 'three elements must exist: (1) a [final] judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits.'"[101] But "whether a particular cause of action in a patent case is the same as or different from another cause of action has special application to patent cases, and we therefore apply our own law to that issue."[102] As such, the Court applies Tenth Circuit law to the first and second elements- final judgment and identity of parties or

---

[100] *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1165 (Fed. Cir. 2018) (citing *Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344, 1348 (Fed. Cir. 2014)).

[101] *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017) (alteration in original) (quoting *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir. 1997)).

[102] *Senju*, 746 F.3d at 1348 (citing *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008)).

privies elements; and the Court applies Federal Circuit law to the third element—identity of cause of action.  For the reasons explained below, the Court finds all three res judicata elements are present, precluding Wisconsin Archery's claims before this Court.

### 1.    Identity of Parties/ Privity

Garmin argues that Wisconsin Archery and Burris were in privity.  Generally, claim preclusion necessitates that the named parties in the first and second suits be identical.[103]  "An exception to this rule exists when it can be said that there is 'privity' between a party to the second case and one who is bound by an earlier judgment."[104]  "Privity requires, at a minimum, a substantial identity between the issues in controversy and showing the parties in the two actions are really and substantially in interest the same."[105]  The Tenth Circuit "has recognized that no definition of privity can be 'automatically applied in all cases involving the doctrine of res judicata.'"[106]

The Supreme Court provided six categories of recognized exceptions to the general rule against nonparty preclusion: (1) when a person agrees to be bound by the determination of issues in an action between others; (2) when a pre-existing substantive legal relationship exists; (3) when a nonparty was "adequately represented by someone with the same interests who [wa]s a party" in an earlier suit; (4) when the nonparty assumed control over the earlier litigation; (5) when a party who did not take part in litigation, as a way of avoiding preclusion, later sues as the

---

[103] *Pelt v. Utah*, 539 F.3d 1271, 1281 (10th Cir. 2008).

[104] *Id.* (citing *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 798 (1996)).

[105] *Lowell Staats Min. Co. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1275 (10th Cir. 1989).

[106] *Century Indem. Co. v. Hanover Ins. Co.*, 417 F.3d 1156, 1159 (10th Cir. 2005) (quotation omitted).

designated representative of a person who was a party to the earlier suit; and (6) when a special statutory scheme, such as bankruptcy, so directs.[107]

Garmin argues the License Agreement evidences Burris and Wisconsin Archery satisfy at least two of the above categories: (1) pre-existing substantive legal relationship; and (2) adequate representation by a party with the same interests. The Court agrees with Garmin that there is a pre-existing substantive legal relationship between Wisconsin Archery and Burris. But the Court need not reexamine all the above details of Wisconsin Archery's and Burris's legal relationship. For it is axiomatic that a legal relationship that satisfies the rigorous requirements of the substantial rights test also satisfies its privity analysis.[108]

Here, through its legal relationship with Wisconsin Archery, Burris had the exclusive and discretionary right to bring the Burris Lawsuit and was only obligated to notify Wisconsin Archery of any potential or actual noninfringement and whether Burris was to institute an action. Wisconsin Archery never argues Burris failed these notice requirements. Nor does Wisconsin Archery identify any authority that found a license agreement conveyed standing to a licensee without also satisfying the privity standard. Instead, Wisconsin Archery again argues that there is no privity because it terminated the License Agreement before the Burris Lawsuit settled due to Burris's material breach of withdrawing from the related IPR. As explained above, Wisconsin Archery's argument on this front is unsuccessful.

---

[107] *Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008).

[108] *Id.* at 894 ("Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and **assignee and assignor**.") (emphasis added); a legal relationship that satisfies the substantial rights test also satisfies the privity examination because the exception for such a qualifying relationship "originated 'as much from the needs of property law as from the values of preclusion by judgment.'" *Id.* (citing 18A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4448, at 329 (2d ed. 2002)).

## 2.   Same Claim or Cause of Action

Second, Garmin argues the causes of action between the two suits are identical because both concern the same noninfringement theories of the '551 Patent.  Wisconsin Archery counters that there is no identity because the present action concerns new patent claims issued through *ex parte* reexamination of the '551 Patent.  "[W]hether a particular cause of action in a patent case is the same as or different from another cause of action has special application to patent cases, and we therefore apply our own law to that issue."[109]  "In determining whether causes of action for patent infringement are the same, [the Federal Circuit is] guided by the Restatement (Second) of Judgments (1982)."[110]

Adhering to the Restatement, courts define a cause of action by the transactional facts from which it arises, and courts consider the extent of the factual overlap between the two alleged claims at issue.[111]  In patent cases, one of the areas of factual overlap courts consider "is the overlap of *the product or process* accused in the instant action with *the product or process* accused in the prior action."[112]  With this, courts also consider whether the same patents are at issue in both suits.[113]  "Importantly, under well-settled principles of claim preclusion, different arguments or assertions in support of liability do not all constitute separate claims.  Regardless of the number of substantive theories available to a party and regardless of the differences in the evidence needed to support each of those theories, a party may not split a

---

[109] *Senju*, 746 F.3d at 1348 (citing *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008)).

[110] *In re PersonalWeb Techs. LLC*, 961 F.3d 1365, 1374 (Fed. Cir. 2020) (citing *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1165 (Fed. Cir. 2018)).

[111] *See Gillig v. Nike, Inc.*, 602 F.3d 1354, 1363 (Fed. Cir. 2010) ("Claims arising from the same nucleus of operative facts are barred by res judicata.").

[112] *Senju*, 746 F.3d at 1349.

[113] *Id.*

single claim into separate grounds of recovery and raise those separate grounds in successive lawsuits."[114]

Here, the question turns on whether new patent claims permitted in an *ex parte* reexamination can be meaningfully distinguished from the original claims of the same patent that were at issue in the first litigation. Wisconsin Archery argues this analysis requires a claim-by-claim comparison, which Garmin did not provide despite having the burden to do so.[115] But the Court agrees with Garmin that Wisconsin Archery misrepresents the *Aspex Eyewear* analysis. For the Federal Circuit is clear that claims issued from a reexamination are identical to the original claims for purposes of claim preclusion because reexamination is statutorily mandated to narrow a patent's scope.[116]

Wisconsin Archery relies on *Aspex Eyewear* and *SimpleAir* as authority that its new claims granted through reexamination create new causes of action. First, Wisconsin Archery is correct that *SimpleAir* provides an exception to whether reexamination must narrow the scope of a patent, thus requiring a comparison of the claims.[117] But that exception only presents itself with claims in *continuation* patents subject to a terminal disclaimer.[118] That exception exists simply because a continuation can theoretically create a larger claim scope to a patentee than a

---

[114] *In re PersonalWeb*, 961 F.3d at 1375 (citing *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 478 (Fed. Cir. 1991); *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616, 619 (Fed. Cir. 1995); Restatement (Second) of Judgments § 24 cmt. a.).

[115] *See* Doc. 62 at 14 (citing *Aspex Eyewear*, 672 F.3d at 1335 (Fed. Cir. 2012)).

[116] *Senju*, 746 F.3d at 1350.

[117] *SimpleAir*, 884 F.3d at 1166–67.

[118] *Id.* at 1167.

patentee held via the parent patent.[119]  In this sense, continuation patents are more akin to reissue patents, and neither are relevant to a patent that went through reexamination.[120]

Next, Wisconsin Archery argues *Aspex Eyewear* requires that a defendant asserting claim preclusion against alleged infringement of a reexamined patent must provide a substantive comparison of the claims, and that a court must utilize a substantive comparison of claims to determine whether new causes of action are present.  But *Aspex Eyewear* does not require what Wisconsin Archery suggests.  Rather, the *Aspex Eyewear* court simply stated the new claim at issue was not materially different from the original claim before emphasizing that claims provided through reexamination are necessarily narrower than their original counterparts, therefore "claims that emerge from reexamination do not create a new cause of action that did not exist before."[121]  To the extent *Aspex Eyewear*  answers whether reexamination could ever result in the issuance of new patent claims that were so materially different from the original claims as to create a new cause of action, but also were sufficiently narrow so as not to violate the rule against reexamined claims being broader than the original claims, Wisconsin Archery has not made such an argument.  And the Federal Circuit has not provided an answer.[122]

Finally, Wisconsin Archery argues that this case exemplifies the narrow exception to res judicata where there was a deficiency undermining the requirements of due process in the original proceeding.  But Wisconsin Archery's argument on this point is the same as its position

---

[119] *Senju*, 746 F.3d at 1353.

[120] *SimpleAir*, 884 F.3d at 1166–67.

[121] *Aspex Eyewear*, 672 F.3d at 1342 (citing *Hoffman v. Wisner Classic Mfg. Co.*, 927 F. Supp. 67, 73 (E.D.N.Y. 1996)); *see* 35 U.S.C. § 305 ("No proposed amended or new claim enlarging the scope of a claim of a patent will be permitted in a reexamination proceeding under this chapter.").

[122] *Senju*, 746 F.3d at 1353 ("We hold that, in the absence of a clear showing that such a material difference in fact exists in a disputed patentable reexamination claim, it can be assumed that the reexamined claims will be a subset of the original claims and that no new cause of action will be created.  This applies whether the judgment in the original suit was based on invalidity of the claims or simply on non-infringement.").

on Burris's standing in the Burris Lawsuit, and is likewise unsuccessful. The heart of this dispute is that Wisconsin Archery wants another shot at litigating non-infringement, because it is unhappy with Burris's enforcement of the '551 Patent. But this "second bite at the apple" is exactly what claim preclusion was designed to prevent.[123]

### 3.      Final Judgment on the Merits

Third, claim preclusion requires "a [final] judgment on the merits in an earlier action."[124] Here, the parties do not dispute that the voluntary dismissal of the Burris Lawsuit in the U.S. District Court for the District of Oregon was a final judgment on the merits for purposes of res judicata.[125] Further, the voluntary dismissal of Burris's infringement claims against Garmin was with prejudice and stipulated that Garmin was "the prevailing party." Wisconsin Archery never sought to intervene or limit the dismissal in any way.[126]

In sum, the Court finds Garmin established all three claim preclusion elements. Thus, because the Burris Lawsuit accused Garmin's Xero A1 and Xero A1i products of infringing the '551 Patent, those claims are precluded. However, the Federal Circuit has generally held that claim preclusion cannot apply to acts of alleged infringement that occur after the final judgment in the earlier suit.[127] Likewise, if the requirements of *issue* preclusion are not met, relief under that doctrine will not be available to protect post-judgment activity.[128] Yet, this action also

---

[123] *Senju*, 746 F.3d at 1353 ("Claim preclusion exists to 'encourage[ ] reliance on judicial decisions, bar[ ] vexatious litigation, and free[ ] the courts to resolve other disputes.'" (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979))).

[124] *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir. 1997).

[125] *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017) (finding a voluntary dismissal with prejudice of a prior federal litigation was a final judgment on the merits).

[126] *In re PersonalWeb*, 961 F.3d at 1378 (finding noninfringement claims were abandoned where the with-prejudice dismissal failed to attach any contingencies).

[127] *See Brain Life*, 746 F.3d at 1054.

[128] *Id.* at 1056.

includes Garmin's post-Burris Lawsuit products: the Xero A1i Pro and the Xero X1i. As such, courts turn to the infrequently invoked *Kessler* doctrine to fill the gap left by claim and issue preclusion by "allowing an adjudged *non-infringer* to avoid repeated harassment for continuing its business-as-usual post-final judgment in a patent action where circumstances justify that result."[129]

### C.    *Kessler* Doctrine

The *Kessler* doctrine serves to fill the temporal gap between the preclusion doctrines by barring assertion of the claims at issue against essentially the same products made or sold after the judgment of noninfringement in the earlier case.[130] Wisconsin Archery argues the *Kessler* doctrine only applies to products that existed at the time of the preclusive judgment; however, the Court reads the case law applying the *Kessler* doctrine differently. As the Federal Circuit explained in *SimpleAir*, the Kessler doctrine bars "assertion of the claims [previously] at issue against essentially the same products **made or sold after the judgment** of noninfringement in the earlier case."[131]

On April 2, 2020, the Oregon District Court dismissed the Burris Lawsuit with prejudice pursuant to Burris and Garmin's Joint Notice of Voluntary Dismissal. Around August 2021, Garmin announced the Xero A1 Pro bow sight, and then subsequently released the Xero A1 Pro sight for sale in the Fall of 2021. The parties do not dispute that Garmin's newer Xero A1i Pro and Xero X1i are essentially the same as the older Xero A1 and Xero A1i products. In fact, Wisconsin Archery does not dispute or provide any fact or expert testimony or opinions that

---

[129] *Brain Life*, 746 F.3d at 1056.

[130] *SimpleAir*, 884 F.3d at 1170 ("[I].e., products that claim preclusion could not reach because of their timing.").

[131] 884 F.3d at 1170 (emphasis added).

rebuts Garmin's statement of facts and expert report stating that newer Xero A1i Pro and Xero X1i are essentially the same as the older Xero A1 and Xero A1i products.  As such, because the products are essentially the same, for the purposes of the *Kessler* doctrine, the Xero A1i Pro and the Xero X1i are precluded for the same reasons as the Xero A1 and Xero A1i products.[132]

**IT IS THEREFORE ORDERED BY THE COURT** that Garmin's Motion for Summary Judgment (Doc. 56) is **granted**.  Wisconsin Archery's Motion for Summary Judgment (Doc. 52) is **denied**.  The Clerk shall enter final judgment in favor of Garmin on all claims.

**IT IS SO ORDERED.**

Dated: March 17, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[132] *Id.* ("*Kessler* 's rationale is that the accused activity, held in the earlier case not to infringe the patent, acquires a limited trade right to continue being practiced 'without molestation' by the patentee or its privies.") (citing *Kessler v. Eldred*, 206 U.S. 285, 285 (1907)).